**FLORIDA WILDLIFE FEDERATION, a Florida not-for-profit corporation; and Sierra Club Inc., a not-for-profit corporation, Plaintiff,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS; and Colonel Robert M. Carpenter, District Engineer, in his official capacity, Defendants,**

**Palm Beach County and The Scripps Research Institute, Intervenors.**

No. 0580339–CIV.

United States District Court,
S.D. Florida.

Nov. 10, 2005.

Edwin Thom Rumberger, Rumberger Kirk & Caldwell, Tallahassee, FL, David P. Reiner, II, Reiner & Reiner, Miami, FL, Lisa B. Interlandi, Robert N. Hartsell, Lake Park, FL, Richard Joseph Grosso, Environmental & Land Use Law Center Inc., Fort Lauderdale, FL, for Florida Wildlife Federation, a Florida not for profit corporation; Sierra Club Inc., a not for profit corporation, Plaintiffs.

Norman O. Hemming, III, United States Attorney's Office, Miami, FL, for Colonel Robert M. Carpenter, District Engineer, in his official capacity, United States Army Corps of Engineers, Defendants.

## ORDER

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon the parties' memoranda on remedies.[1] The Court has reviewed the record, heard the parties' arguments, and is otherwise fully advised in the premises.

In this action, Plaintiff environmental groups challenged the issuance of a permit by the U.S. Army Corps of Engineers ("the Corps") to Palm Beach County ("the County") allowing the dredging and filling of jurisdictional wetlands for the development of the Palm Beach County Biotechnology Research Park / Scripps Project. On September 30, 2005, this Court granted summary judgment in favor of Plaintiffs, and directed the parties to file memoranda on the issue of remedies. A hearing on remedies was held on November 8, 2005.

For the reasons provided below, I conclude that the appropriate remedy is to set aside the Corps' permit, remand the matter to the Corps for further proceedings consistent with the Court's September 30, 2005 Order, and, with certain exceptions, enjoin the County from further construction on the Mecca Farms site pending adequate environmental review. Although I decline to enjoin Scripps' construction of three buildings on the site, I am in no way endorsing such construction, nor do I mean to suggest that developing a Research Park on Mecca Farms is environmentally sound or otherwise feasible. That determination must remain with the Corps, Scripps and officials of Palm Beach County.

### I. BACKGROUND

In October 2003, Palm Beach County and The Scripps Research Institute joined forces to develop plans for the Palm Beach County Biotechnology Research Park, a biotech industry cluster with Scripps as its anchor.

The State of Florida agreed to provide $310 million of economic stimulus funds over a period of seven years for the project, and the County pledged to spend up to $200 million to provide land, infrastructure and buildings for the new Scripps Florida facility.

The County and Scripps selected Mecca Farms, a 1,919–acre parcel in western

---

1. This includes Plaintiffs' Memorandum of Law on Remedies (DE 75); Defendants' Memorandum of Law with Regard to Remedy (DE 73); Intervenor Palm Beach County's Memorandum of Law Addressing Remedies for Order on Cross Motions for Summary Judgment (DE 74); and Intervenor The Scripps Research Institute's Memorandum of Law on Remedies (DE 77). The Court has also considered Plaintiffs' Reply Memorandum of Law on Remedies (DE 86); Defendants' Response to Plaintiffs' Memorandum of

Law with Regard to Remedy (DE 84); Intervenor Palm Beach County's Response to Plaintiffs' Memorandum of Law on Remedies (DE 80); and The Scripps Research Institute's Reply to Plaintiffs' Memorandum of Law on Remedies (DE 89).

In addition, the Court has considered the County's Response to this Court's Order Dated October 18, 2005 (DE 82), regarding the status of construction at the Mecca site and the provision of power to its proposed project.

Palm Beach County, as the site for the project. Scripps leased 102.03 acres on the southeastern portion of the property, and planned to construct three buildings on 44 acres of that land. The County would make the remaining property available to other biotech-related companies and support facilities, enabling the County to recover costs associated with the project. Portions would also be used to enhance surrounding ecosystems, meet water management goals, and buffer nearby residential properties.

Mecca Farms was historically part of the Hungryland Slough, and predominately wetland. Mecca is bordered to the east, west, and north by environmentally sensitive lands, including the J.W. Corbett Wildlife Management Area ("Corbett"), the Hungryland Slough, and Vavrus Ranch, which contains numerous, high value wetlands.

To prepare Mecca Farms for agriculture, ditches were constructed in place of historic flow ways, running every 360 feet throughout the property. The agricultural ditches are permanently inundated and drain into the C–18 Canal, a tributary of the Northwest Fork of the Loxahatchee River, a National Wild and Scenic River.

The U.S. Army Corps of Engineers deemed these wetlands to be waters of the United States, and asserted jurisdiction over them under the Clean Water Act, 33 U.S.C. § 1251 et seq.

On or about May 13, 2004, the County submitted an application to the Corps for a permit to allow the dredging and filling of jurisdictional wetlands on the Mecca Farms site. In its application, the County narrowed its "proposed project" to construction on only 535 acres of the 1,919 acre site. The 535–acre portion of the site contained 21.38 acres of jurisdictional wetlands.

Before issuing the permit, federal law required the Corps to determine whether the proposed action would have a significant impact on the environment. National Environmental Policy Act, 42 U.S.C. § 4321 et seq. To make this determination, the Corps was required to take a "hard look" at the direct, indirect and cumulative effects of the proposed action on the environment, including those effects that were reasonably foreseeable. If the Corps found the proposed action would have a significant impact on the environment, it was required to prepare an Environmental Impact Statement ("EIS") before issuing the permit.

Although the Corps was aware of the County's plans to develop the remainder of Mecca Farms for the Research Park Project, including road extensions that the Corps believed would present troublesome environmental issues, and construction of a power substation on the adjacent Corbett conservation lands, the Corps limited its assessment of the environmental impacts to the direct effects of filling jurisdictional wetlands for the 535–acre phase of the project, only. The Corps then found that the proposed project would have no significant impact on the environment.

On February 22, 2005, the Corps issued the permit without preparing an EIS.

On February 28, 2005, Plaintiff Florida Wildlife Federation notified the Corps and the County of its intent to challenge the permit in federal court. Also on February 28, 2005, the County submitted an application to the Corps for construction of the power substation on Corbett that would serve the entire 1,919 acre planned development.

By late May 2005, the County had dredged and/or filled all jurisdictional wetlands on the 44 acres where Scripps planned to construct its three buildings.

On April 21, 2005, Plaintiffs filed this action against the Corps, alleging that the

issuance of the permit violated the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and the Rivers and Harbors Act of 1899 ("RHA"). Plaintiffs did not move for preliminary injunctive relief.

On June 2, 2005, the parties agreed to an expedited briefing schedule and advised the Court that they believed the matter would be resolved on their cross-motions for summary judgment.

On July 29, 2005, the Court denied a joint motion by the County and Scripps to intervene in the merits phase of the case, because the only issue before the Court was whether the Corps had lawfully issued the permit. Recognizing the practical and economic interests of the County and Scripps, however, the Court granted them status as *Amici Curiae* during the merits phase. The Court also granted the County and Scripps status as parties during any remedial phase in the litigation.

On September 26, 2005, the Court heard argument from Plaintiffs, the Corps and the County on the parties' cross motions for summary judgment. By that time, the County had filled most the jurisdictional wetlands throughout the 535–acre site.

On September 30, 2005, this Court issued its order on the merits, concluding that the Corps had violated NEPA by issuing the permit without adequate environmental review. Specifically, the Court found that:

(1) The Corps failed to consider important environmental effects, anticipated by the Corps itself, of planned road expansions for the remainder of the Research Park Project, while the proposed project included an on-site extension of PGA Boulevard illogically drawn to end in a cul-de-sac;

(2) The Corps' determination that the proposed project had independent utility from the remainder of the planned development on Mecca Farms was not adequately supported, but rather controverted, by the record;

(3) The Corps failed to properly identify and take a hard look at the indirect, growth-inducing effects of its action, particularly given that the Scripps project is designed to serve as a catalyst for expansion;

(4) The Corps declined to consider the cumulative effects of the remained planned development of the Research Park Project, including plans to construct a power substation on Corbett to supply the entire Mecca site, of which the Corps was abundantly aware; and

(5) The Corps improperly narrowed the scope of its environmental impacts analysis to the direct effects of the 535–acre proposal, while expanding the scope of its benefits and alternatives analysis to include the entire 1,919 acre project.

## II. Status of Construction on Mecca Farms

In response to inquiries from the Court, the County provided the following information regarding the status of construction on Mecca Farms as of the Court's September 30, 2005 Order.

By the time the Court's Order issued, 19 of the 21.38 acres of jurisdictional wetlands on the 535–acre portion of the site had been filled. The County had yet to fill 2.38 acres and dredge 1.2 acres of wetlands allowed by the permit.[2] At the remedies

---

**2.** On October 5, 2005, the County began to fill a portion of a remaining irrigation ditch. Upon further consideration of the Court's Order, however, the County instructed its construction crew to discontinue that operation, and to excavate the deposited fill.

hearing, the County stated that mitigation measures, required by the permit to compensate for this environmental harm, had not been completed.

In August 2005, the County began work on infrastructure for the site, including roadway and drainage improvements to Seminole Pratt Whitney Road and Biotech Parkway a/k/a PGA Boulevard, installation of Florida Power & Light ("FPL") conduit and manholes, and water mains, force mains and utility sleeves for future utility placements. According to the County, this work does not require additional filling and dredging of wetlands, but does occur in areas where wetlands have already been filled.

As of September 30, 2005, roughly fifteen percent of the work contemplated in the County's nearly $9 million construction contract had been completed.[3] The largest components of that contract are work to be performed relative to PGA Boulevard, and work required for Mecca infrastructure. Together, these activities constitute sixty-three percent (63%) of the contract work. Only a fraction of each of these components had been completed as of September 30, 2005: 4.35% of PGA Boulevard, and 2.94% of Mecca infrastructure. A substantial portion had been completed on the remainder of the contract; specifically, 40.47% of work on Seminole Pratt Whitney Road and 35.7% of work related to Florida Power & Light.

The County also planned to begin construction of phase III of the Northern Region Pipeline Project in November 2005. According to the County, this project is intended to serve the Mecca site, but is also necessary to serve the Beeline Community Development District and Seacoast Utilities Authority, regardless of whether the Research Park is constructed. This activity would not require the additional dredging and filling of wetlands.

Scripps advised the Court that it began construction on 44 acres of its 102–acre parcel on September 26, 2005. Scripps stated that access to the parcel was available by existing roads, namely Northlake Road and Seminole Pratt Whitney. As of October 21, 2005, Scripps had constructed internal access roads, installed an office trailer complex for construction, and brought electrical power to the site to support construction. Scripps had also dug foundations and poured concrete. Scripps expected that the footings for all three buildings would be completed by the end of October, and the first-floor columns by mid-November.

According to Scripps, it had received one $5 million gift that required Scripps' permanent facilities to be built on the 44–acre site in accordance with the current construction schedule at Mecca. Scripps had also expended $17 million in design and construction of the facilities, and, under its construction contract, had committed to spend $120 million over the next twenty-two months.

III. REMEDIES

Having prevailed on the merits, Plaintiffs ask the Court to (1) the set aside the Corps' permit; (2) order the Corps to perform an EIS taking into account the effects of all reasonably foreseeable impacts identified in the Court's September 30, 2005 Order or in the administrative record; and (3) enjoin all development of the project, including vertical construction on areas already filled, pending completion of the environmental review.

---

3. The County stated that the costs of construction were being borne by Palm Beach County Roadway Production ($4,555,190.40), Palm Beach County Facilities Development & Operations ($2,246,331.55) and Florida Power & Light ($2,059,614.00).

Defendants, the County and Scripps, on the other hand, ask the Court to remand the matter to the Corps for further consideration in light of the Court's Order, and to take no further action at this time.

### A. THE SECTION 404 PERMIT

■ Under the Administrative Procedures Act ("APA"), the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). On September 30, 2005, this Court found the Corps' environmental assessment not to be in accordance with the law, and its finding of no significant impact to be arbitrary and capricious. Accordingly, the permit must be aside.

### B. ENVIRONMENTAL IMPACT STATEMENT (EIS)

■ Plaintiffs also ask the Court to direct the Corps to prepare an EIS before issuing any subsequent permit for the project.

Under NEPA, an EIS is required for any major federal action significantly affecting the environment. 42 U.S.C. § 4332(C). There is considerable evidence in this record to suggest that the environmental impacts of the proposed project, taking into account direct, indirect and cumulative effects, would be significant.

Federal regulations provide that a determination regarding "significance" requires consideration of both context and intensity. Context considerations include the affected region, interests and locality, varying with the setting of the action, and include both short and long-term effects. Intensity refers to the severity of impact, including impacts that may be both beneficial and adverse; unique characteristics of the geographic area, such as proximity to wetlands, wild and scenic rivers, or ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; and whether the action is related to other actions with individually insignificant but cumulatively significant impacts. 40 C.F.R. § 1508.27.

The record shows that Mecca Farms is situated in a unique geographic area, bordered by wetlands and conservation areas. Mecca's jurisdictional wetlands drain into the navigable waters of the C–18 Canal and Loxahatchee River, a nationally designated Wild and Scenic River and a component of the Everglades Ecosystem. The record suggests that development of the Research Park in what is currently an agricultural site would not only replace all previous uses on Mecca Farms, but would also induce growth and dramatically transform the characteristics of the surrounding area. Comments from other federal regulatory agencies and the public regarding the indirect and cumulative effects of the project suggest that the size, scope and nature of the proposed project's impacts are highly controversial.

In addition, the Corps initially determined that the 535–acre project would have independent utility in part because power could be supplied through an existing transmission line, even though the County's preference was to construct a substation on Corbett that could serve the entire development. Days after the Corps issued the permit, the County filed another application with the Corps to construct the substation on Corbett.[4] Then, following the Court's September 30, 2005 Order, the County advised the Corps that "from a contractual standpoint, the alternatives [to constructing a substation on Corbett] were no longer options," because pursuing any of those would cause additional delay.

---

4. The Corps has not yet made a determination    regarding that application.

It is worthwhile to note that while the County's permit application for the 535–acre Research Park Project was pending, the U.S. Fish and Wildlife Service ("the Service") was conducting an environmental review of a separate application by the County to the Florida Wildlife Commission ("FWC") for five easements on Corbett to provide infrastructure to the 1,919 acre Research Park Project. These included construction of the FPL substation and transmission poles/lines, modifications to the Corbett Canal, and the widening and extension of Seminole Pratt Whitney Road.

On August 2, 2004, the FWC had asked the Service to review the application for approval because the acquisition of Corbett was partially funded through the Pittman–Robertson Wildlife Restoration Act, 16 U.S.C. § 669 *et seq.*, and because the uses proposed by the County were inconsistent with the purposes for which the tracts were acquired.

On February 24, 2005, just days after issuing the Research Park permit to the County, the Corps sent a letter to the Service urging it to consider the indirect and cumulative effects of the proposed action. According to the Corps, the land trade to facilitate a transportation corridor and a power source would not have independent utility from (1) the remainder of the planned Mecca Farms development; (2) the development of Vavrus Ranch; and (3) the construction of the future roads. On August 5, 2005, the Service issued a Finding of No Significant Impact (FONSI) for the proposed easements.

Also, since the Court's September 30, 2005 Order, the County has advised the Corps and the Court that it now intends to submit a dredge and fill permit application to develop all of Mecca Farms for the Research Park. Importantly, the County concedes—and counsel for the Corps has in principle agreed—that it is likely such an application will require the preparation of an EIS; in other words, that such a proposal would have a significant impact on the environment.

This Court has already determined that the Corps' finding of no significant impact was arbitrary and capricious because it was not supported by the record and was based on an inadequate environmental review under the law. The Court, however, is generally not to substitute its own judgment for that of an administrative agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

Although there are exceptions to this rule, where courts have found significance based on the record and directed agencies to prepare EIS's, the Court in this case defers in the first instance to the Corps' determination, based on proper consideration of all relevant factors, whether the impacts of the proposed action on the environment would be significant. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)("[i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *see also Hill v. Boy,* 144 F.3d 1446 (11th Cir.1998).

C. INJUNCTIVE RELIEF

Lastly, Plaintiffs ask the Court to enjoin further development of the project, including vertical construction in jurisdictional areas already filled, to preserve the *status quo* pending completion of the environmental review.

The Corps, the County and Scripps, all contend that the Court does not have juris-

**1360**

diction to enjoin the County or Scripps, because this action was brought against the Corps, only, for violations of NEPA, a federal statute that only requires compliance by the Corps. Indeed, Plaintiffs have not pursued a cause of action against the County or Scripps. The County and Scripps were not defendants in this case. As noted above, they were heard as *Amici Curiae* during the merits phase of the litigation, and have been granted intervenor status during this remedial phase.

■ The Court has broad and inherent equitable authority to grant injunctive relief for the violation of common law, statutory or constitutional rights. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir.2004).

■ While injunctions are typically issued against a party, a court may also enjoin a third party under limited circumstances, where necessary to ensure the effectiveness of its orders. Under the All Writs Act, 28 U.S.C. § 1651(a),[5] an injunction "may be directed to not only the immediate parties to a proceeding, but to 'persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and . . . even those who have not taken any affirmative action to hinder justice.' " *Klay*, 376 F.3d at 1100.

In NEPA cases, courts have enjoined non-federal entities pending further environmental review after finding violations of NEPA by a federal agency under two sets of circumstances.

In the first scenario, the federal agency is in some way also a proponent of the proposed project, including by having provided federal funds. *See, e.g., Named Individual Members of San Antonio Conservation Soc. v. Texas Highway Dep't*, 446 F.2d 1013 (5th Cir.1971)(enjoining state construction of highway project that had received federal funds, even after state expressed commitment to construct the project with only its own funds).[6]

In the second scenario, courts have enjoined non-federal permit applicants pending further NEPA review by the federal agency. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir.2004)(affirming district court's injunction limiting access to wilderness areas by commercial packstock operators until Forest Service complied with NEPA); *Save Greers Ferry Lake, Inc. v. Dep't of Defense*, 255 F.3d 498 (8th Cir.2001)(enjoining property owners' use of boat docks constructed pursuant to permit until Corps complied with NEPA); *Fritiofson v. Alexander*, 772 F.2d 1225 (5th Cir.1985)(over-ruled on other grounds by *Sabine River Authority v. U.S. Dept. of Interior*, 951 F.2d 669 (5th Cir.1992)(upholding continued injunction against private housing developer pending NEPA compliance by the Corps)).

Scripps cites several cases where courts found it would not be proper to enjoin non-federal actors for NEPA violations by federal agencies. *See, e.g., Biderman v. Morton*, 497 F.2d 1141 (2d Cir.1974)(affirming lower court's finding of no basis to enjoin municipalities from issuing construction permits and zoning variances pending environmental review, where federal authori-

**5.** Title 28, United States Code, Section 1651(a) provides that: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

**6.** In *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir.1981), the Eleventh Circuit adopted Fifth Circuit decisions issued prior to October 1, 1981 as binding precedent.

ty was limited to condemnation of property constructed after implementation of local ordinances; court noted, "this [is not] a case in which nonfederal action cannot lawfully begin or continue without the prior approval of a federal agency"); *Vieux Carre v. Brown,* 875 F.2d 453 (5th Cir.1989)(affirming district court's denial of an injunction on the basis that neither the Administrative Procedures Act nor the Rivers and Harbors Act gave a private plaintiff a cause of action against any defendant other than the Corps); *Fund for Animals v. Lujan,* 962 F.2d 1391 (9th Cir.1992)(finding it would be improper and inequitable to enjoin state defendants from killing bison on state lands, where state received no federal funds to hunt and kill bison, state voluntarily agreed to cooperate in federal plan to manage killing of bison, and prior federal approval to kill bison was not required).

Those cases, however, are distinguishable from the particular circumstances presented here. In this case, the County was required to obtain a valid permit from the Corps before it could begin construction of its Research Park Project. The Corps' obligations to comply with NEPA before issuing such a permit were mandatory. Furthermore, the Corps has asserted that it has jurisdiction over related projects and plans, including the proposed power substation on Corbett and development of the remainder of Mecca Farms. Federal approval from the U.S. Fish and Wildlife Service was required for the County to obtain the easements on Corbett allowing for the power substation and road expansions. In addition, although no cause of action has been asserted against the County or Scripps, some level of injunctive relief is necessary to give any effect to the Court's findings that the

Corps unlawfully issued that permit, that additional environmental analysis was required before the permit issued, that the permit must be set aside, and that important environmental concerns raised by the project have not yet been examined as required under NEPA.

■ Injunctive relief is not mandatory under NEPA, however, and the Court must nevertheless balance equitable factors to determine whether an injunction is appropriate in this case.

Under its traditional equitable authority, the Court may grant an injunction if the moving party establishes that: (1) it has prevailed on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.[7] *Klay,* 376 F.3d at 1097.

1. PLAINTIFFS HAVE PREVAILED ON THE MERITS

On September 30, 2005, this Court granted summary judgment in favor of Plaintiffs. The Plaintiffs have therefore prevailed on the merits.

2. IRREPARABLE INJURY

■ Plaintiffs contend that they will suffer irreparable injury if construction is allowed to continue on the Mecca Farms site, because then they will have no remedy for the NEPA violations the Court has found. Without an injunction, Plaintiffs argue, the Research Park Project would be a *fait accompli;* environmental effects not yet examined would begin to occur; any alternatives analysis would be skewed by

7. Although this element is generally considered in the case of preliminary injunctions, only, because the relief granted here may be

temporary (injunctive relief pending further administrative action) the Court will also consider the public interest prong in this case.

the presence of the Scripps facilities and Research Park infrastructure; and any further environmental review would be entirely ineffective.

The County, on the other hand, asserts that the likelihood of a cognizable, irreparable and physical injury to the environment absent an injunction is slight. Scripps asserts that continued construction ·of its facilities will not cause irreparable environmental harm because its 44–acre construction site is not adjacent to any of the environmental resources that are of concern to the Plaintiffs, nor would it require off-site road improvements or commit resources not already committed.

In this case, however, the irreparable injury to Plaintiffs is not simply the direct environmental harm from the dredging and filling of wetlands on the 535–acre parcel. Rather, the principal harm to Plaintiffs is the Corps' permitting of such activity for the construction of a large-scale, growth-inducing development in an environmentally sensitive area, without first taking into account the reasonably foreseeable indirect and cumulative effects of such action.

■ A fundamental purpose of NEPA is "to ensure that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (citations omitted); *see also North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1540 (11th Cir. 1990). If construction is not enjoined, these as yet unexamined effects would begin to take place, and no amount of subsequent environmental analysis would undo them. *See, e.g., Protect Key West, Inc. v. Cheney,* 795 F.Supp. 1552 (S.D.Fla.1992) ("Irreparable harm results where environmental concerns have not been addressed by the NEPA process").

Scripps urges the Court not to enjoin construction pending "procedural compliance" with NEPA. Compliance with NEPA, however, is not a triviality, but rather a fundamental component of federal environmental protection to assure that informed decisions are made before it is too late. These decisions must be informed not only by the permitting agency's perspective, but must also allow other interested federal agencies and the public to be heard. What is more, it cannot be denied that allowing substantial development of a project creates momentum that typically cannot be reversed. As the now Justice Breyer observed while on the Court of Appeals for the First Circuit:

> The harm at stake in a NEPA violation *is* a harm to the *environment,* not merely to a legalistic "procedure[.]" The way that harm arises may well have to do with the psychology of decisionmakers, and perhaps a more deeply rooted human psychological instinct not to tear down projects once they are built. But the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation. The difficulty of stopping a bureaucratic steam roller, once started, still seems to us ... a perfectly proper factor for a district court to take into account in assessing that risk[.]

*Sierra Club v. Marsh,* 872 F.2d 497, 503 (1st Cir.1989)(emphasis in original).

In particular, the Corps, the County and Scripps conclude that construction of the Scripps' facilities would not foreclose the Corps' alternatives analysis. At the hearing, the Corps agreed that any subsequent decision by the agency would factor in whether better alternatives existed, but that completed work on Mecca would not affect the analysis.

> THE COURT: And in deciding whether there are better [alternatives] or

not, are you going to disregard or consider the fact that some work has already been done at Mecca?

THE CORPS: That would be disregarded in that regard, yes, Your Honor. We would not take that into account ... The fact that the buildings are there essentially is irrelevant to that because they are not in navigable water.

THE COURT: Since the ditches have already been filled?

THE CORPS: Since the ditches are already filled.

I am not entirely persuaded. Other courts have noted how environmental analysis could become distorted by construction of initial parts of a project. *See, e.g., Davis v. Mineta,* 302 F.3d 1104 (10th Cir.2002)(enjoining phase 1 of a project because, although defendants argued that the principal harm alleged would arise from subsequent phases, court found a serious risk arises that the analysis of alternatives required by NEPA would be skewed toward completion of the entire project if any construction were permitted before the environmental analysis was complete).

Perhaps most importantly, the Corps' argument is premised on its position that it no longer has jurisdiction over the areas already filled, even though the permit has been invalidated and mitigation has not been completed. If this were the case, then there would be no basis for further NEPA analysis. An agency would be able to issue a permit that is unlawful under NEPA, but then disclaim jurisdiction when the work specifically authorized by the permit is substantially completed, even though the project for which the permit has been obtained is not. NEPA compliance would become a mere formality, and an agency would be free to abdicate its responsibilities under the statute with no remedy for those harmed. Although

NEPA is not a substantive statute, and does not mandate any particular result, such an analysis would render it a complete nullity.

Accordingly, the Court finds that Plaintiffs have established they would suffer irreparable harm if construction is not enjoined.

3. BALANCE OF HARMS

In addition to establishing that irreparable injury will result if construction is not enjoined, Plaintiffs must show that this harm outweighs harm to those who would be enjoined.

The County argues that the balance of equities weighs against an injunction, on the basis that the County has expended significant funds and resources for permanent facilities for Scripps. Within days of the issuance of this permit, however, the County was on notice of Plaintiffs' intent to sue. It was the County that elected to act on the challenged permit, dredging and filling wetlands, beginning construction, and continuing construction even after the Court granted summary judgment in favor of Plaintiffs. While the County was not precluded from taking such action, it acted knowingly, and at its own risk. That County funds have been expended in that process, pending judicial review of the Corps' permit, was the County's choice.

The Court concludes that, on the whole, the balance of harms between Plaintiffs and the County weighs in favor of Plaintiffs. However, as discussed below in more detail, the Court finds that the equities weigh in the County's favor as to certain components of the construction plans, and those will be excluded from the scope of the injunction, as provided below.

Scripps argues that its construction of three buildings on the 44–acre parcel should not be enjoined based on consider-

ations of the public interest and the unique position Scripps occupies in this case.

Scripps argues that any construction delay caused by an injunction would (1) harm scientists and impede research by the lack of available facilities as planned; (2) cripple Scripps' ability to recruit additional scientists due to uncertainty surrounding construction; (3) jeopardize corporate and private research funding; and (4) increase construction costs beyond presently allocated funds. Scripps states that its temporary space at Florida Atlantic University is already at capacity, and is inadequate to accommodate additional research. In addition, Scripps contends that failure to meet recruitment objectives may jeopardize funding from the State, as well as its commitments to the County under their Grant Agreement.

Plaintiffs dispute some of these contentions, arguing that Scripps' contract with the County provides for such delays, and that Scripps would be able to continue its research at other locations where research is already underway.

Scripps has nevertheless raised a number of points that the Court finds tilt the balance of equities in its favor. First, all the jurisdictional wetlands on the 44–acre parcel where Scripps is building its three facilities were filled before the instant action was even filed. Scripps argues it should not be penalized when Plaintiffs could have, but failed to, seek an order postponing the effective date of the Corps' permit or other preliminary relief to preserve their rights pending judicial review. Second, by the time the land was delivered by the County to Scripps in late May 2005, Scripps itself required no federal permits or authorization to undertake its construction. Third, Scripps has received a $5 million gift requiring its permanent facilities to be built on the 44–acre site in accordance with the current construction schedule at Mecca.

Scripps stated it was committed to constructing these three buildings, even if no further construction occurred.

COURT: Is there a logic to finishing these three buildings even if you were unable to go forward with the rest of it?

SCRIPPS: Absolutely. These buildings will house Scripps' operations. This is where world class scientists will have their laboratories, meeting spaces, computers, super computer, all of the other equipment that allows not only the research to be done by Scripps but also collaboration to be done by the University of Florida and others throughout the state. It's in these three buildings. The buildings are specially designed for air handling that would support this highly specialized and expensive equipment that can't be housed in other places.

COURT: Do you really want to go forward with just those in the face of—I mean the Corps says they may well say no to the rest of it.

SCRIPPS: [. . .] If they were to deny additional permit requests for permission to fill waters of the United States and it meant that other entities could not locate their buildings in very close proximity to these three, Scripps is prepared to accept that.

In an affidavit, a representative for Scripps stated that access to the three buildings to be built on the 44–acre parcel is already available by existing roads: Northlake Road and Seminole Pratt Whit-

ney Boulevard. It is worth noting that at the hearing, the County took the position that the planned extension of Seminole Pratt Whitney into Mecca Farms and the construction of PGA Boulevard (a/k/a Biotech Parkway) eastward would be necessary to reach the Scripps buildings. At the hearing, however, Scripps confirmed that no additional roads would be needed.

> COURT: What about roads? I mean you need roads to get there. What if PGA can't be extended ... do [your three buildings] still work?

> SCRIPPS: Absolutely.

Lastly, Scripps stated that existing power to the site was sufficient to support construction, although additional power would be needed in the upcoming years to support the buildings and scientific equipment inside.

Although Scripps has been touted as the "anchor" of the future Research Park, and designed to serve as a catalyst for further construction, I find that the totality of the factors outlined above, particularly in view of the different footing on which Scripps stands in this litigation and the injunctive relief I will grant, weigh against enjoining Scripps' construction of its three buildings.

In refusing to stop construction by Scripps, I am in no way suggesting that construction should proceed or that Mecca is the best, or even an appropriate, site for the facilities. That is not a decision for me to make, but rather for the County and Scripps. This ruling simply reflects the different legal posture occupied by Scripps under the circumstances of this case. Construction is a risky proposition, since the outcome or timing of the required environmental analysis is difficult to predict.

There is no guarantee that the remainder of the project can be completed once all relevant environmental impacts are taken into account. During oral argument, counsel for the County stated:

> [T]he County fully understands that there's at least a theoretical possibility that at the end of the EIS and the alternatives study or the environmental analysis, whatever it is that the Corps does, they will say no project here at all.

The County added that it believed that in the event no project was allowed, the County could recoup its losses by selling Mecca Farms. At this juncture the parties may wish to consider whether "build now—study later" is the best approach, particularly where substantial public funds and environmental resources are at stake.

4. THE PUBLIC INTEREST

Lastly, the Court considers whether enjoining the County's construction at Mecca Farms would be adverse to the public interest.

The County asserts that an injunction would impede the State and County's economic development efforts, including job growth, and cause additional delay in biomedical research to be conducted at the site.

Plaintiffs state that an injunction would not be adverse to the public interest because the contract between the County and Scripps provides for up to a four-year delay for all project deadlines as a result of litigation, and ensures funding at current levels during any such delay. Plaintiffs also argue that the needless expenditure of public funds by the County for a planned Research Park that, upon further environmental review, may not be permitted at the site, is itself adverse to the public interest.

I am satisfied that carefully tailored injunctive relief is not adverse to the public interest. The Court's ruling today is designed simply to assure that the Corps is able to conduct a full and fair environmental analysis before environmental effects that have not yet been examined begin to

take place. Once that objective is met, the fate of the Research Park Project will be shaped by the Corps' lawful determinations of whether permits should be granted or denied, and by decisions by the County and Scripps as to how to proceed.

In addition, in view of the magnitude of the Research Park Project, the environmentally sensitive setting of Mecca Farms, and the fact that the County's project involves the expenditure of public funds, I find that the public interest will be served by an appropriate injunction ensuring that full and fair environmental review is performed before it is too late.

5. SCOPE OF INJUNCTION

An injunction "should be tailored to restrain no more than what is reasonably required to accomplish its ends." *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir.2003)(quoting *Consolidation Coal Co. v. Disabled Miners of Southern W.Va.*, 442 F.2d 1261, 1267 (4th Cir.1971)).

In tailoring the appropriate injunctive relief here, I am mindful that the objective is to allow the Corps to conduct a full and fair analysis of all environmental impacts of the proposed project without foreclosing any options or alternatives, and before any resources are irretrievably committed. Having carefully considered the elements of injunctive relief, I find that a wholesale injunction of all construction on the Mecca Farms site would be overly broad to accomplish the intended purpose.

As noted above, it would be inequitable to enjoin Scripps from construction of its three buildings on the 44–acre parcel of its 102 acre site. It is, however, necessary and appropriate to enjoin the County from any further development or construction on the Mecca site, with some exceptions.

Specifically, I exclude completion of the work on Seminole Pratt Whitney Road (but not PGA Boulevard / Biotech Parkway) currently underway, because this construction was more than 40% complete as of September 30, 2005, the costs associated with stopping and starting such construction would be unduly burdensome, and completion of the road would not require the additional dredging or filling of wetlands.

I will also exclude construction of phase III of the Northern Region Pipeline Project, which the County maintains is necessary to serve the Beeline Community Development District and Seacoast Utilities Authority, regardless of whether the Research Park is constructed, and also does not require any additional dredging or filling of jurisdictional wetlands.

Lastly, I do not enjoin mitigation measures designed to compensate for the environmental harm caused by the dredging and filling of jurisdictional wetlands. While the Corps, after full environmental review, may ultimately decide that more mitigation is necessary, it is unlikely the Corps would require less.

I also do not find it necessary to enjoin the County from filling or dredging the remaining acres of jurisdictional waters, since to do so absent a permit would be unlawful.

D. CONCLUSION

The National Environmental Policy Act does not require an environmentally sound decision, nor does it mandate a particular outcome. It simply seeks to avoid the harm caused by uninformed decisions. In fashioning the remedies provided here, I have tried to protect the integrity of the environmental analysis required by Congress, yet preserve the latitude and ability of elected officials that are accountable to their constituents to determine the location, scope and nature of a project, rather than have a result forced by delay.

Accordingly, it is hereby

ORDERED AND ADJUDGED that the U.S. Army Corps of Engineers Section 404 Permit No. SAJ–2004–2859 (IP–AAZ) is SET ASIDE; this matter is REMANDED to the Corps for reconsideration in light of the Court's September 30, 2005 Order; it is further

ORDERED AND ADJUDGED that the County, its officers, representatives, agents, and assignees are ENJOINED from any further development authorized by the permit, including any vertical construction on jurisdictional areas already filled, on the Mecca Farms site pending issuance of a lawful permit. This injunction does not apply to:

1. Completion of the construction of Seminole Pratt Whitney Road component of the County's construction contract, which as of September 30, 2005 was more than 40% completed;

2. Construction of phase III of the Northern Region Pipeline Project, which the County maintains is necessary to serve the Beeline Community Development District and Seacoast Utilities Authority, regardless of whether the Research Park is constructed;

3. Any mitigation measures to compensate for the environmental harm caused by the dredging and filling of jurisdictional wetlands; it is further

ORDERED AND ADJUDGED that the Court retains jurisdiction to enforce the terms of this Order, and to modify the terms of the relief provided herein.