**DEVELOPERS SURETY AND, INDEMNITY COMPANY, a foreign corporation, Plaintiff,**

**v.**

**BI–TECH CONSTRUCTION, INC., a Florida corporation, and Rafael I. Aguado, individually, Defendants.**

**Case No. 13–22767–CIV.**

United States District Court, S.D. Florida.

Oct. 17, 2013.

Edward Etcheverry, Jeffrey Scott Geller, Guy William Harrison, Etcheverry & Harrison LLP, Plantation, FL, for Developers Surety and Indemnity Company.

Jon Michael Kendrick, Valdini & Palmer, Fort Lauderdale, FL, for Bi-Tech Construction, Inc. and David J. Valdini & Associates, P.A.

Rafael I. Aguado, Pro Se.

### ORDER ADOPTING REPORT OF MAGISTRATE JUDGE

WILLIAM P. DIMITROULEAS, District Judge.

THIS CAUSE is before the Court upon the Report and Recommendations of Magistrate Judge Lurana S. Snow, dated September 20, 2013, (the "Report") [DE 40]. The Court notes that no objections to the Report [DE 40] have been filed, and the time for filing such objections has passed. As no timely objections were filed, the Magistrate Judge's factual findings in the Report [DE 40] are hereby adopted and deemed incorporated into this opinion. *LoConte v. Dugger,* 847 F.2d 745, 749–50 (11th Cir.1988), *cert. denied,* 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988); *RTC v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir.1993).

Although no timely objections were filed, the Court has conducted a *de novo* review of the Report [DE 40] and record and is otherwise fully advised in the premises. The Court agrees with the Magistrate Judge's recommendations in full.

■ Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The Report [DE 40] is hereby **ADOPTED** and **APPROVED**;

2. Any funds remaining in the Bank of America Accounts ending in –0869

and –2093, and in any other accounts maintained at Bank of America in the name(s) of either of the Indemnitors are frozen and Bank of America shall turn over such funds to Surety in partial or full satisfaction of the Injunction;

3. The Indemnitors' assets are frozen and are, therefore, prevented from being transferred, sold, dissipated, or otherwise disposed of without further order of Court until Indemnitors bring themselves in compliance with the Injunction;

4. The Injunction is hereby converted to a Partial Judgment in favor of the Surety in the amount of $219,896.82, with specific findings that Indemnitors committed fraud, defalcation and embezzlement, as those terms are defined under 11 U.S.C. § 523(a)(4);

5. The Partial Judgment also recognizes the Indemnitors' assignment of $36,000 from the Douglas Gardens Community Mental Health Center and of any and all contract proceeds due and owing under the Bonded Contract;

6. Expedited discovery to address the fraudulent conveyances and to permit the Surety to enforce its rights under the Partial Judgment is granted, including but not limited to requiring the Indemnitors' full and complete production of documentation responsive to a formally issued Request for Production within ten (10) days thereof, and requiring the deposition of Aguado and the corporate representative of Bi–Tech within two (2) weeks from receipt of the requested documentation;

7. The Surety is awarded all attorneys' fees and costs incurred in connection with its pursuit and enforcement of the Injunction; and

8. The Court finds that the Indemnitors' intentionally and willfully violated the Injunction

## *REPORT AND RECOMMENDATION*

LURANA S. SNOW, United States Magistrate Judge.

THIS CAUSE is before the Court on Developers Surety and Indemnity Company's ("Plaintiff" or "Surety") Motion for Expedited Entry of Order Enforcing Preliminary Injunction dated August 21, 2013 ("Motion") (DE 15), which was referred to United States Magistrate Judge Lurana S. Snow for Report and Recommendation. The Court construed the motion as a motion to show cause why the Defendants, Bi–Tech Construction, Inc. ("Bi–Tech") and Rafael I. Aguado ("Aguado") (collectively with Bi–Tech "Defendants" or "Indemnitors") should not be held in contempt or sanctioned.

The Court ordered expedited briefing and scheduled a Show Cause Hearing for Thursday, September 5, 2013 [DE 22], at which time it heard arguments of counsel and accepted documentary evidence stipulated by the parties. Despite the Order to Show Cause, neither a representative of Bi–Tech nor Aguado appeared at the hearing. As a result, the Court continued the Show Cause Hearing on Tuesday, September 10, 2013, and required Defendants to appear and testify as to why they should not be held in contempt and sanctioned.

The Defendants failed to appear at the September 10, 2013 Show Cause Hearing. The Court again heard the arguments of counsel and accepted additional documentary evidence stipulated by the parties. Having carefully considered the Motion [DE 15], the Response [DE 17], the Reply [DE 18], the Plaintiff's Proposed Findings

of Fact and Conclusions of Law [DE 31] as well as the Defendants' Response [DE 34], and the Plaintiff's Reply thereto [DE 39], the record, and all other evidence presented at the Show Cause Hearings held on September 5, 2013 and September 10, 2013, the Court submits the following Findings of Fact and Recommendations of Law.

## I. *FINDINGS OF FACT*

### A. *Procedural Background*

1. On August 19, 2013, the Court entered its Order Granting Motion for Preliminary Injunction ("Injunction") [DE 14], 964 F.Supp.2d 1304, 2013 WL 4563657 (S.D.Fla.2013), and ordered the Defendants to post collateral security with the Surety in the amount of $205,000.00. The Court ordered the security to be posted no later than August 20, 2013

2. In their Response to the Motion, the Defendants conceded that they have failed to post the $205,000.00 in collateral as required by the Injunction; however, they claim that they were unable to raise the required funds, and requested an opportunity to present evidence at a show cause hearing.

3. At the Show Cause Hearing held on September 5, 2013, Defendants failed to appear in person and did not offer any evidence to demonstrate they did not possess the financial capability to raise the required funds. Instead, the Defendants authorized their counsel to confess a judgment in favor of the Surety in the collateral amount of $205,000.00, and assign $36,000.00 allegedly owed to Bi-Tech from a project for Douglass Gardens Community Mental Health Center and $130,000.00 allegedly owed to Bi-Tech on the bonded project. [Ex. 19, ¶¶ 12, 13 and 14].

4. In response, Plaintiff presented evidence showing that Defendants intentionally and willfully disregarded the Injunction. Plaintiff argued and presented evidence that Defendants, as Indemnitors, committed fraud and defalcation while acting in their fiduciary capacity as the trustee of contract funds received by Bi-Tech on the bonded project. Plaintiff contended that the Defendants embezzled the trust funds for their personal use and benefit, fraudulently divested themselves of such funds, and/or otherwise continue to maintain access to the defalcated funds.

5. The Court refrained from making any rulings to allow the Defendants an opportunity to appear in person to respond to the Plaintiff's allegations of fraud, defalcation and embezzlement.

6. At the continuation of the Show Cause Hearing held on September 10, 2013, Defendants again failed to appear in person. They neither offered any evidence regarding their financial inability to raise the required funds, nor any evidence contesting the Plaintiff's allegations.

### B. *Factual Background*

7. On October 16, 2012, the City of Florida City, Florida ("City" or the "Owner") awarded a contract to Bi-Tech to install a new emergency generator system ("Project" or "Bonded Contract"). The Project was worth $670,153.64. Plaintiff, acting as surety, issued two bonds (the "Performance Bond" and the "Payment Bond"; collectively, "Bonds") on behalf of Bi-Tech. [DE 14].

8. As a condition to issuing the Bonds, Surety required the Indemnitors to execute an Indemnity Agreement dated June 29, 2011. [Ex. 12]. Pursuant to Article 4 of the Indemnity Agreement—"FUNDS IN TRUST FOR SURETY"—the Indemnitors agreed to:

... hold all money and all other proceeds of the Obligation, however received, in trust for the benefit of Surety and to use such money and other proceeds for the purposes of performing the Obligation and for discharging the obligations under the Bond, and for no other purpose until the liability of the Surety under the Bond is completely exonerated."

The Indemnity Agreement further required in Article 7—"ASSIGNMENT"—that the Indemnitors:

... assign, transfer, pledge and convey to Surety, effective immediately upon and only in the event that there shall be an event of default hereunder, all rights in and to the Obligation and the documents, contracts or entitlements creating the Obligation, including, but without limitation, all right, title and interest in and to:

7.1 Any and all contracts or subcontracts let in connection therewith and any contractor's or subcontractor's surety bonds.

\* \* \*

7.3 Any and all sums due or which may become due upon partial or full performance of the Obligation and all sums due or to become due on all other contracts, covenants and agreements whether bonded or unbonded, in which the Principal or Indemnitor has any interest, together with any notes, accounts receivable or chose in action related thereto.

Article 5 of the Indemnity Agreement—"DEFAULT"—defines an event of default to include "[a]ny default in the performance of an Obligation by Principal or any declaration by any obligee of an Obligation that Principal is in default thereunder."

9. On February 19, 2013, the City issued its Notice to Proceed to Bi–Tech to perform under the Bonded Contract. [Ex. 20].

10. On March 25, 2013, Bi–Tech submitted, and then on May 2, 2013 resubmitted, its first and only payment application to the City. [Ex. 1, ¶ 6 and Ex. 15]. "The work covered by this payment application consisted mainly of trench work for the instillation [sic] of electrical wiring. The entities primarily responsible for that work were Bi–Tech's subcontractor, General Construction Master Corp. ("GCM"), and GCM's supplier, City Electric Supply Co. ("City Electric")." [Ex. 1, ¶ 6].

11. On May 13, 2013, the City partially paid Bi–Tech $219,896.82 (the "Trust Funds") in connection with its payment application. [Ex. 1, ¶ 9]. Despite receiving the payment from the City, Bi–Tech failed to pay GCM and City Electric for the labor and materials furnished to the Bonded Project. [Ex. 7 and 30]. City Electric has subsequently filed suit against Surety, seeking to recover in excess of $172,000 under the Payment Bond, in the action styled *City Electric Supply Co. v. Bi–Tech Construction, Inc. et al,* in the Circuit Court of the Eleventh Circuit in and for Miami–Dade County, Florida, Case No. 2013–23438–CA–01. [DE 13, Ex. A].

12. Immediately upon receipt of the City's payment, Bi–Tech deposited the Trust Funds into its Bank of America operating account ending with –0869 (the "BOA Account"). On May 21, 2013, eight (8) days later, Bi–Tech transferred $200,000 from the BOA Account to an undisclosed checking account ending with –2093 (the "Undisclosed Account")[1]. [Ex. 27].

---

**1.** By the *Order* entered on September 6, 2013 [DE 27], the Court required the Indemnitors to produce, in advance, any documents they

intended to rely upon at the continued Show Cause Hearing. Despite producing certain documents related to the BOA Account, the

13. On May 29, 2013, the City declared a default and terminated Bi–Tech's rights under the Bonded Contract. [Ex. 21]. On the same day, Bi–Tech transferred an additional $60,000 from the BOA Account to the Undisclosed Account. [Ex. 27].

14. As of May 29, 2013, Bi–Tech's Profit & Loss Statement for the Project (the "P & L Statement") confirmed that there were no payments to subcontractors or suppliers on the Project from the date of Bi–Tech's receipt of the Trust Funds through the date of termination. [Ex. 19 and 30].

15. On May 30, 2013, the City made demand against the Surety under the Performance Bond. [Ex. 25].

16. As part of the Surety's investigation, Surety met with Bi–Tech on June 14, 2013 and the City on July 2, 2013. [Ex. 1, ¶¶ 12 and 13, and Ex. 2]. As a result of the meeting with the City, the Surety propounded a proposed Memorandum of Understanding ("MOU") to Bi–Tech, contemplating the resolution of the City's Performance Bond claim. [Ex. 1, ¶ 15].

17. In early July, 2013, and as included in the proposed MOU, the Surety and Indemnitors engaged in a series of communications whereby the Surety demanded that Bi–Tech satisfy all outstanding financial obligations of its subcontractors and suppliers, specifically including but not limited to GCM and City Electric, and provide "written confirmation" of same. [Ex. 3]. As a condition to the execution of the MOU, the Surety demanded the Indemnitors to produce Bi–Tech's bank statement(s) confirming that the Trust Funds were available to satisfy the unpaid subcontractors and suppliers. [Ex. 4].

Indemnitors failed to produce any documentation related to the Undisclosed Account ref-

18. On July 15, 2013, and given the Indemnitors' continued failure to provide the bank statement(s), the Surety reiterated its demand, stating that "[t]he matter is now time critical." [Ex. 5]. On the same day, the Indemnitors transferred $173,000 from the Undisclosed Account into the BOA Account, coupled with a transfer of $5,000 on July 11, 2013, for a total deposit of $178,000.00. [Ex. 27].

19. On the next day, July 16, 2013, the Indemnitors and their counsel provided a detailed breakdown establishing that Bi–Tech had utilized a portion of the Trust Funds in the amount of $219,896.82 to allegedly satisfy certain subcontractors and suppliers on the Project in the amount of $39,250.48. [Ex. 6]. Accordingly, at that time, the Indemnitors and their counsel represented that Bi–Tech's account contained $180,181.79 in Trust Funds, which fact was confirmed by the Indemnitors' counsel at the Show Cause Hearing on September 5, 2013. [Ex. 5].

20. As of July 15, 2013, Bi–Tech's Line of Credit of $100,000.00 reflected an available balance of $84,860.98, indicating that Bi–Tech had only utilized the sum of $15,139.02 therefrom. [Ex. 26].

21. On July 17, 2013, the Indemnitors' counsel acknowledged that Bi–Tech maintained an outstanding obligation to GCM "in a small amount" and to City Electric in the amount of $172,000. [Ex. 7].

22. On July 24, 2013, Bi–Tech and the Surety reached an impasse on the MOU. [Ex. 8]. The Surety immediately issued its demand letter to the Indemnitors, reiterating their Trust Fund obligations under the Indemnity Agreement, and making demand for the immediate payment to GCM

erenced in the BOA Account documentation.

and City Electric with a deadline of Friday, July 26, 2013 at 3:00 p.m. [Ex. 9].

23. On July 25, 2013, the Surety inquired as to the status of utilizing the Trust Funds to satisfy the required payments to the identified subcontractor and supplier. [Ex. 10]. In response, on July 26, 2013, the Indemnitors' counsel acknowledged to the Surety that he has "advised [the Indemnitors] they need to do so." [Ex. 10].

24. By its demand letter dated July 29, 2013, the Surety declared the Indemnitors in default of their Trust Fund obligations under the Indemnity Agreement, and made formal demand upon the Indemnitors for the immediate posting of collateral in the amount of $205,000. [Ex. 11].

25. As of July 31, 2013, the BOA Account held a balance of $183,549.00. [Ex. 27].

26. On August 1, 2013, the Surety filed its Complaint for Damages and Injunctive and Other Equitable Relief against the Indemnitors ("Complaint") [DE 1]. Simultaneous therewith, the Surety served its Motion for Preliminary Injunction upon the Indemnitors' counsel ("Motion for Injunction"). [DE 5].

27. After being placed on notice of their Trust Fund obligations and suit being filed, the Indemnitors transferred the Trust Funds in the amount of $180,181.79 into the Undisclosed Account. [Ex. 27]. In fact, the Indemnitors transferred $177,500.00 on August 2, 2013—the day after the Complaint and Motion for Injunction were filed. [Ex. 27].

28. Three (3) days after the Court entered its Injunction, the Indemnitors transferred the sum of $36,241.79 into the Undisclosed Account. [Ex. 27]. Six (6) days later, the Indemnitors transferred an additional $625.00, leaving a resulting balance in the BOA Account as of August 31, 2013 of $1,633.12. [Ex. 27].

29. On August 22, 2013—the day of the $36,241.79 transfer—the Indemnitors filed their Response to the Motion, representing that "Defendants non-compliance, however, is not a willful violation but rather is simply the result of an inability to raise the required funds." [DE 17, ¶ 2].

30. During this period, Aguado sold a parcel of real property on July 31, 2013, upon on which there was an existing Mortgage to JP MorganChase Bank, N.A. ("Mortgage"). [Ex. 14]. On August 19, 2013, Aguado recorded a Satisfaction of Mortgage in the amount of $149,805.00. [Ex. 14]. At the Show Cause Hearing on September 5, 2013, the Surety argued that its Trust Funds were utilized to satisfy the Mortgage. Given the Court's own concerns about this real estate transaction, the Court provided the Defendants another opportunity to appear in person to demonstrate what funds were actually utilized to pay-off the Mortgage. Defendants failed to present any evidence at the continuation of the Show Cause Hearing as to the source of funding used to satisfy the Mortgage.

31. Finally, on August 23, 2013, four (4) days after the Injunction was entered, Aguado entered into a Purchase Agreement for a 2011 BMW 550i, financing the sum of $53,782.64. [Ex. 28].

C. *Evidentiary Conclusions*

32. The City's payment to Bi–Tech in the amount of $219,896.82 constitutes Trust Funds under the Indemnity Agreement.

33. The Indemnitors failed to present any credible evidence that the Trust Funds received from the City on May 13, 2013 in the amount of $219,896.82 "were used to pay subcontractors, consultants,

pay overhead, and repay loans." [Ex. 19, ¶ 5]. Indeed, Indemnitors' admission that they used the $219,896.82 to pay for "consultants", "overhead", and "repay loans" [Ex. 19, ¶ 5], standing alone, constitutes a defalcation while acting in a fiduciary capacity.

34. The evidence affirmatively demonstrates that the full amount of $219,896.82 should have been maintained by the Indemnitors as Trust Funds, for the benefit of the Surety, as required under the Indemnity Agreement. Indemnitors fail to present any credible evidence that any portion of the $219,896.82 satisfied the claims of the unpaid subcontractors and suppliers on the Bonded Project. No cancelled checks, invoices or other evidence of payment to subcontractors and suppliers was presented.

35. The P & L Statement sworn to by Aguado was intended to show how the Trust Funds were utilized by Bi–Tech. [Ex. 19, ¶ 7]. By its own admission, however, Bi–Tech expended the sum of $77,692.65 before the City even issued its Notice to Proceed on February 19, 2013. [Ex. 30]. Further, Bi–Tech admits that it expended the sum of $71,864.65 after receipt of the Notice to Proceed but before receipt of the City's payment on May 13, 2013. [Ex. 30]. The Court finds that neither of these amounts can be properly assessed against the Trust Funds in the amount of $219,896.82, as all such payments were made before Bi–Tech received such funds.

36. The P & L Statement further reflects that between Bi–Tech's receipt of the Trust Funds and Bi–Tech's termination on May 29, 2013, Bi–Tech expended the sum of $22,762.63. [Ex. 30]. The evidence demonstrates that such expenditures did not constitute payments for labor or materials specifically attributable to the Project, but rather comprised general office overhead and expenses, which were not direct job costs. [Ex. 30]. Payment for such expenses constitutes a defalcation of the Trust Funds. Further, the P & L Statement reveals entries for "bills/invoices" for such general office overhead and expenses, without evidence of actual "payments" made by Bi–Tech. The Court finds that the Indemnitors failed to present any credible evidence in support of their contentions, and that the $22,762.63 cannot be properly assessed against the Trust Funds in the amount of $219,896.82. [Ex. 30].

37. The P & L Statement reflects that Bi–Tech incurred post-termination expenditures in the amount of $123,618.31, representing the "Costs of Good Sold" in the amount of $17,199.91 and "Total Expenses" of $106,418.40. [Ex. 30].

38. Having been terminated on the Project, Bi–Tech had no legal right to utilize the $106,418.40 to satisfy its post-termination general office overhead and expenses. For instance, the P & L Statement reflects that Bi–Tech, post-termination, paid $91,427.48 in "6320—Professional Fees—Other" to Bi–Tech's accountant, Hoyos & Aguilar, CPA ($2,766.50) [Ex. 30], claims consultant, Daniel Diamond ($67,660.98) [Ex. 29 and 30], and to Aguado personally ($21,000.00). [Ex. 30]. Further, the P & L Statement reflects that Bi–Tech, post-termination, paid $1,723.94 to its litigation counsel. [Ex. 30].

39. Likewise, Bi–Tech had no legal right to utilize the $17,199.91 to satisfy alleged subcontractor and material costs identified in the "Costs of Good Sold". [Ex. 30]. For instance, the P & L Statement reflects that Bi–Tech, post-termination, paid $4,000.00 to Rafaul Aguado, II [Ex. 30], who was Bi–Tech's Field Supervisor [Ex. 1, ¶ 1]. Moreover, the P & L Statement reveals entries in "5050–Subcontrac-

tors" for "bills/invoices" from CDS Castellanos Design Studio LLC ($7,770.00) and EMB Engineering, Inc. ($639.90). Furthermore, in "5100–Job Materials", Bi–Tech represents "bills/invoices" totaling $2,229.91. None of these entries evidence actual "payments" made by Bi–Tech. [Ex. 30]. In fact, Indemnitors have failed to produce any cancelled checks, invoices, or other evidence of payment for the entries in the P & L Statement.

40. The Court finds that the Indemnitors failed to present any credible evidence in support of their contentions that the post-termination expenditures in the amount of $123,618.31 can properly be assessed against the Trust Funds in the amount of $219,896.82. [Ex. 30]. Again, such payments constitute a defalcation of the Trust Funds.

41. The P & L Statement provides no evidence that the Trust Funds received from the City were used to repay any loans. [Ex. 30]. While there is no evidence of any actual loans taken by Bi–Tech, if the Trust Funds were utilized to pay such loans, then any repayment would constitute a defalcation of the Trust Funds. [Ex. 30].

42. By their own admissions, the Defendants possessed the sum of $180,181.79 in Trust Funds as of July 15, 2013 [DE 5], and the BOA Account statement evidences that these funds were still in the account as of August 2, 2013. [Ex. 27]. The Indemnitors failed to present any credible evidence that the available Trust Funds as of July 15, 2013 consisted of the "$100,000 line of credit", "payments received on other projects" or "loans to Bi–Tech". [Ex. 19, ¶ 8]. The Court finds that as of August 2, 2013, the Indemnitors held the sum of $180,181.79 in Trust Funds, before wrongfully converting or embezzling such funds from the BOA Account into the Undisclosed Account.

43. Based upon the foregoing, the Court finds that the Indemnitors, jointly or severally: (a) committed a defalcation of the Trust Funds while acting in a fiduciary capacity; (b) committed fraud while acting in a fiduciary capacity; (c) embezzled the Trust Funds; and (d) intentionally and willfully violated the Injunction.

## II. *RECOMMENDATIONS OF LAW*

### A. *The Court Has Broad Discretion in Enforcing its Injunction*

This Court has broad discretion to enforce its previous injunction. *See Smith Barney, Inc. v. Hyland,* 969 F.Supp. 719 (M.D.Fla.1997) (court has numerous options in imposing sanctions to ensure compliance with injunction, as long as sanctions are not greater than necessary to ensure compliance); *Alderwoods Group, Inc. v. Garcia,* 682 F.3d 958 (11th Cir. 2012) (court that issued injunction possesses the power to enforce compliance with, and punish contempt of, that order); *Farmhand, Inc. v. Anel Engineering Industries, Inc.,* 693 F.2d 1140 (5th Cir.1982) (court maintained jurisdiction to supervise its injunction and properly entertained motion for contempt).

Orders freezing assets and prohibiting transfers from bank accounts are routine methods of enforcing injunctive relief, even if they are directed to third parties in possession of the funds. *See, TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC* 929 F.Supp.2d 1255 (M.D.Fla.2013) (order directing law firm that received funds to hold those funds in trust pending disgorgement); *In re King,* 463 B.R. 555 (Bankr.S.D.Fla.2011) (injunction freezing defendants' bank accounts); *ITT Community Development Corp. v. Barton,* 457 F.Supp. 224 (M.D.Fla.1978) (injunction freezing bank accounts). *See also, Johnson v. Couturier,* 572 F.3d 1067 (9th Cir.

2009) (preliminary injunction freezing assets and bank accounts). *See, e.g. Mirage Resorts, Inc. v. Quiet Nacelle Corp.*, 206 F.3d 1398, 1399 (11th Cir.2000) (where appropriate, garnishment may be enforced by mandatory injunction compelling payment as opposed to mere money judgment); *Florida Wildlife Federation v. U.S. Army Corps of Engineers*, 404 F.Supp.2d 1352 (S.D.Fla.2005) (while injunctions are typically issued against a party, a court may also enjoin a third party under limited circumstances, where necessary to ensure the effectiveness of its orders); *Allen v. School Bd. for Santa Rosa County, Florida*, 787 F.Supp.2d 1293 (N.D.Fla.2011), *citing Nat'l Spiritual Assembly of the Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Baha'is of U.S. Inc.*, 628 F.3d 837, 848–49 (7th Cir.2010) (an injunction may be enforced against a nonparty in privity with an enjoined party).

**B.** *The Court May Draw Inferences From the Indemnitors' Failure to Appear and Provide Testimony at the Show Cause Hearing*

A party's failure to appear as a witness in a court proceeding justifies the court's drawing of an adverse inference against such a party. *See, e.g., In re MGL Corp.*, 2001 WL 204729 (Bankr.E.D.Pa. 2001); *SEC v. North American Planning Corp.*, 1975 WL 4509 (S.D.N.Y.1975), citing 3 Collier ¶ 57.18 at 299; *Lindner v. Kilsheimer*, 289 F.2d 340, 342 (2d Cir.1961) (Friendly, J.) ("the better policy is to leave the bankruptcy court with sufficient freedom to weigh the equities and to draw inferences justified by the circumstances of the particular case.") Moreover, the "[a]pplication of an adverse inference from a party's failure to supply evidence does not depend upon the existence of a subpoena compelling production of that evidence." *In re MGL Corp., citing National Labor Relations Bd. v. International Medication*

*Systems*, 640 F.2d 1110, 1115 n. 3 (9th Cir.1981) (applying adverse inference from failure to produce records); *Int'l Union, UAW v. National Labor Relations Bd.*, 459 F.2d 1329, 1338 (D.C.Cir.1972) (applying adverse inference from failure to produce documents). Such adverse inference can most appropriately be drawn where, as here, it is manifest that the party failing to appear "could be useful and natural witness." *North American Planning Corp.*, 1975 WL 4509, *citing* 2 Wigmore, Evidence § 289 at 173 (3rd ed.1940); McCormick, Evidence § 272 at 656–57 (2d ed.1972); *see also N. Sims Organ & Co., Inc. v. SEC*, 293 F.2d 78, 80–81 (2d Cir. 1961).

Even a party's *failure to call a witness* may permissibly support an inference that the witness' testimony would have been adverse. *See In re Navon*, 364 B.R. 850 (D.Conn.2007); *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 81 (2d Cir. 2000) ("It is well-settled that a party's failure to call a witness may permissibly support an inference that that witness's testimony would have been adverse."); *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 432 n. 10 (2d Cir.1999) (adverse inference permitted when witness' testimony would be material).

Given the foregoing, the Court finds that it is able to draw certain inferences from the Indemnitors' failure to appear and provide relevant testimony. Such inferences, coupled with the evidence presented by the Surety at such proceedings, justify the findings of fact and conclusions of law set forth herein.

**C.** *The Indemnity Agreement Creates a "Trust" Relationship and Establishes the Indemnitors' Fiduciary Obligations to the Surety*

The United States Supreme Court in *Pearlman v. Reliance Ins. Co.*, 371 U.S.

132, 141, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) recognized a surety's right to an equitable trust or lien on bonded contract funds. Under an indemnity agreement, a surety may also enforce its contractual right over trust funds. *See, Matter of Jenkins,* 110 B.R. 74, 76 (Bankr.M.D.Fla.1990); *In re Fox,* 357 B.R. 770, 772 (Bankr.D.Ark.2006) (express trust in indemnity agreement); *In re Wright,* 266 B.R. 848, 851 (Bankr. E.D.Ark.2001) (same); *In re Alcon Demolition,* 204 B.R. 440 (Bankr.D.N.J.1997) (same). "In order for the language of the General Indemnity Agreement to create a fiduciary relationship, i.e., in this case a trust, the language must create a trust, establish a trust corpus, and show an intent by the parties to create a fiduciary relationship." *Matter of Jenkins,* 110 B.R. at 76., *citing NesSmith Electric Co., Inc. v. Kelley (In Re Kelley),* 84 B.R. 225 (Bankr. M.D.Fla.1988). *See also,* Restatement (Second) of Trusts ch. 2 (1957) (Introductory note).

In the instant action, the Court finds that the terms of Article 4 of the Indemnity Agreement are sufficient to create a "trust" in the contract funds received by Bi–Tech from the City in the amount of $219,896.82, and establish a corresponding fiduciary duty owed to the Surety by the Indemnitors. Moreover, the Court finds that the Indemnitors had actual knowledge of their fiduciary responsibilities to the Surety under the Indemnity Agreement.

### D. *The Indemnitors' Committed Fraud, Defalcation, Embezzlement, and Otherwise Breached their Fiduciary Obligations to the Surety by Failing to Properly Utilize the Trust Funds*

The Bankruptcy Court for the United States District Court for the Middle District of Florida in *Matter of Jenkins,* 110 B.R. 74 (Bankr.M.D.Fla.1990) faced a very similar situation to the instant action. In that case, the surety argued that the indemnitor improperly utilized contract funds to satisfy non-bonded debts in contravention of its obligation under the indemnity agreement to utilize contract funds to pay the outstanding claims of subcontractors and materialmen. Instead of paying these claims, the indemnitor paid himself as repayment of loans and advances, issued checks to "cash" and to employees, and transferred funds to another corporation owned by the indemnitor.

After finding that the indemnity agreement created an enforceable "trust" in the contract funds, the *Matter of Jenkins* court specifically held that the indemnitors' wrongful conduct constituted a "defalcation" under 11 U.S.C. § 523(a)(4). *Id.,* at 77; *see also, In re Fox,* 357 B.R. at 779 (holding that defalcation occurs when the trust funds are "used on *any* purpose for which it is not intended," thereby payments for equipment costs, employee burden, job support costs, and general and administrative expenses constituted a defalcation of trust funds); *In re Wright,* 266 B.R. at 851 (applying trust funds to payments other than for labor and materials constituted a defalcation). As in *Jenkins, Fox,* and *Wright,* the Court here finds that the Indemnitors committed a defalcation of the Trust Funds by making payments other than for labor and materials incorporated into the Bonded Project.

Moreover, the United States Supreme Court decision in *Bullock v. BankChampaign, N.A.,* —— U.S. ——, 133 S.Ct. 1754, 185 L.Ed.2d 922, 81 USLW 4292 (May 13, 2013), recently adopted the following standard for "defalcation" under 11 U.S.C. § 523(a)(4):

Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include

as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind sent forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, *Model Penal Code § 2.02(2)(c)*, p. 226 (1985). See *Id.*, *§ 2.02* Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include "wilful blindness"). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.* § 2.02(2)(c), at 226 (emphasis added). *Cf. Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

Applying this standard to the facts of this case, the Court finds that the Indemnitors acted "intentionally" with knowledge that their actions were improper in carrying out their fiduciary duties in handling the Trust Funds for the benefit of the Surety. The Court further finds that the Indemnitors acted "recklessly", with a "conscious disregard" or being "willfully blind" to a substantial and unjustifiable risk that their conduct would violate the fiduciary duties in the handling of the Trust Funds, thereby constituting defalcation. This finding satisfies the definition of "defalcation" under 11 U.S.C. § 523(a)(4) as addressed in *Bullock*.

The elements to establish "fraud" include (1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the representation. *See Pence v. U.S.*, 316 U.S. 332, 62 S.Ct. 1080, 86 L.Ed. 1510 (1942); *see also, In re Piercy*, 140 B.R. 108 (Bankr.D.Md.1992) ("Fraud" by a fiduciary, within meaning of nodischargeability provision of Bankruptcy code, "requires positive fraud or fraud in fact, involving moral turpitude or intentional wrong"). Here the Court finds that the Indemnitors' actions constitute "fraud" as, at all times relevant hereto, the Indemnitors represented to the Surety that the Trust Funds were available to satisfy the unpaid subcontractor and supplier. Such representations were material and knowingly false, misleading the Surety into believing that the Trust Funds were available. Accordingly, in reliance on Indemnitors' misrepresentation, the Surety took no action to protect its rights to the Trust Fund, allowing the Indemnitors to fraudulently dissipate, convert, and/or otherwise transfer the Trust Funds which should have been made available to the Surety.

Embezzlement exists where a "party has lawfully come into possession of property which belongs to another and then knowingly and willfully misapplies or converts that property." *In re Rigsby*, 152 B.R. 776 (Bkrtcy.M.D.Fla.1993); *see also In re Jenkins*, 110 B.R. at 76 ("Embezzlement is" the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come). For a claim of embezzlement, "the plaintiff must establish fraud in fact although it can be proven through circumstantial evidence," and "there need not be a fiduciary relationship between the debtor and the creditor."

*Matter of Jenkins,* 110 B.R. at 76. Here, the Court finds that the Indemnitors' actions constitute "embezzlement".

### E. *The Court Should Conform the Motion to the Available Evidence and Award the Surety the Relief Requested*

If the court deems the violation of an injunction willful, it has broad discretion to impose any order of contempt that it deems appropriate. *See Wyatt By and Through Rawlins v. Rogers,* 92 F.3d 1074 (11th Cir.1996) (at show cause hearing on plaintiff's motion seeking to obtain compliance by defendant with terms of injunctive order, if plaintiff establishes defendant's noncompliance with order and defendant presents no lawful excuse for noncompliance, court usually adjudges defendant in civil contempt and imposes sanction that is likely to prompt defendant's compliance with injunction, including to incarcerate defendant or to impose a fine); *In re Grand Jury Proceedings,* 142 F.3d 1416 (11th Cir.1998)(traditional sanctions for defendant's failure to comply with injunction are a fine or imprisonment; the sanction is lifted when defendant purges himself of herself of contempt by complying with injunction). Furthermore, the authorized representatives of the corporate defendant against whom the injunction is entered may be personally held responsible for the corporation's non-compliance with the injunctive order. *See FTC v. Leshin,* 618 F.3d 1221 (11th Cir.2010) (individuals responsible for the affairs of a corporation can be individually held in contempt for disobeying a known injunctive order).

In the Motion, the Surety's prayer for relief included the freezing of the Defendants' assets and precluding them from disposing of their assets pending compliance with the Injunction, and an order directing Bank of America to turn over all funds of the Defendants maintained by Bank of America. The prayer for relief also sought "[s]uch other relief as this Court deems just and proper including but not limited to orders of contempt or orders to show cause against the Defendants." During the course of the Show Cause Hearings, the Defendants produced new information including, but not limited to, the Affidavit of Aguado [Ex. 19], its P & L Statement [appended to Ex. 19], statements from the Line of Credit with BankUnited [Ex. 26], and statements of the BOA Account [Ex. 27]. Plaintiff relied heavily on this new information, which was not available at the time it filed the Motion, to establish the fraud and defalcation of the Indemnitors.

Under Rule 15(b), *Fed.R.Civ.P.,* the Court may permit the pleadings to be amended to conform them to the evidence. The Court should freely allow an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. *Id.; see, e.g., Baker v. Firestone Tire & Rubber Co.,* 793 F.2d 1196 (11th Cir.1986) (Fed.R.Civ.P. 15(b) instructs district courts to grant leave to conform the pleadings to the evidence freely, provided no prejudice to the defendant is shown); *Wallin v. Fuller,* 476 F.2d 1204 (5th Cir.1973) ("At a minimum, the accommodation of rule relating to pretrial procedure to rule governing amendment of pleadings should mean that the more liberal standard of the latter rule should apply when one of the parties seeks amendment to conform the pleadings to issues actually raised by the evidence introduced at trial"); *Pearl Assur. Co. v. First Liberty Nat. Bank,* 140 F.2d 200 (5th Cir.1944) ("If the evidence had been objected to at the trial on the ground that it

was not within the issues made by the pleadings, the Court would have been authorized under this section of the rules to allow amendment of the pleadings so as to facilitate the presentation of the merits of the case, but in the absence of an objection that the evidence is not within the scope of the pleadings, in a case which was tried as if the issue had been raised, an amendment of the pleadings is not imperative"); *Fidelity & Cas. Co. of N.Y. v. Mitchell,* 134 F.2d 537 (5th Cir.1943) (when evidence is introduced without objection, pleadings will be treated as amended to conform to the proof); *Falls Industries, Inc. v. Consolidated Chemical Industries, Inc.,* 258 F.2d 277 (5th Cir.1958), citing, 1 Barron and Holtzoff, Federal Practice and Procedure, Section 449, p. 917 ("Amendments to conform to proof are permitted under Rule 15(b) in order to bring the pleadings in line with the issues actually developed during the trial even though the issues were not adequately presented in the pleadings"). Here, the evidence relied upon by the Plaintiff was produced by the Indemnitors after the Motion was filed, and the parties thereafter stipulated to the entry of such evidence.

Conforming the pleadings to the evidence likewise includes the available relief which may be awarded by the Court. *See Stewart v. Banks,* 397 F.2d 798 (5th Cir. 1968) ("Since, under Federal Rules of Civil Procedure, a final judgment must grant relief to which party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings, allowing amendment of *ad damnum* clause to conform to verdict higher than damages asked for in the pleadings was not error"). Based upon the foregoing, the Court determines that it is appropriate to consider the Motion amended to conform to the evidence presented at the Show Cause Hearings.

### III. CONCLUSION

Having carefully considered the Motion [DE 15], the Response [DE 17], the Reply [DE 18], the Plaintiff's Proposed Findings of Fact and Conclusions of Law [DE 31] as well as the Defendants' Response [DE 34], and the Plaintiff's Reply thereto [DE 39], the record, and all other evidence presented at the Show Cause Hearings held on September 5, 2013 and September 10, 2013, the Court recommends an award in favor of the Surety:

a. Freezing any funds remaining in the Bank of America Accounts ending in – 0869 and –2093, and any other accounts maintained at Bank of America in the name(s) of either of the Indemnitors, and instructing Bank of America to turn over such funds to Surety in partial or full satisfaction of the Injunction;

b. Freezing the Indemnitors' assets, preventing them from transferring, selling, dissipating or otherwise disposing of their assets without further order of Court until they bring themselves in compliance with the Injunction;

c. Converting the Injunction to a Partial Judgment in favor of the Surety in the amount of $219,896.82, with specific findings that Indemnitors committed fraud, defalcation and embezzlement, as those terms are defined under 11 U.S.C. § 523(a)(4);

d. Recognizing in the Partial Judgment the Indemnitors' assignment of $36,000 from the Douglas Gardens Community Mental Health Center and of any and all contract proceeds due and owing under the Bonded Contract;

e. Requiring expedited discovery to address the fraudulent conveyances and to permit the Surety to enforce its rights under the Partial Judgment, including but not limited to requiring the Indemnitors' full and complete production of

**1322**

documentation responsive to a formally issued Request for Production within ten (10) days thereof, and requiring the deposition of Aguado and the corporate representative of Bi–Tech within two (2) weeks from receipt of the requested documentation;

f. Awarding the Surety its attorneys' fees and costs incurred in connection with its pursuit and enforcement of the Injunction; and

g. Finding the Indemnitors' intentional and willful violation of the Injunction, thereby justifying the imposition of any further relief as the Court deems necessary, just and proper to compel the Indemnitors to comply with the Injunction.

The parties will have 14 days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, for consideration by The Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. *LoConte v. Dugger,* 847 F.2d 745 (11th Cir.1988), *cert. denied,* 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988); *RTC v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir.1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 20th day of September, 2013.